FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

2013 JAN 17 PM 1:20

US ...
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

AUSTIN CLARY,

PLAINTIFF,
VS.

CASE NO. _____
6:13-cv-90-ORL-31-KRS

BREVARD COUNTY Sheriff Wayne Ivey and
Armor CORRECTIONAL HEALTH SERVICES, INC.,

Defendants.

_____/

## VERIFIED COMPLAINT; DEMAND FOR JURY TRIAL

Comes now Plaintiff, Austin Clary, and files this "Verified Complaint; Demand for Jury Trial" and states:

### Count I. DELIBERATE INDIFFERENCE TO Serious MEDICAL NEEDS

### against the Sheriff and Armor

42 U.S.C. § 1983

1. Subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, based on the federal civil rights violations alleged herein.

2. This action arises out of violations and injuries claimed to have occurred in Brevard County, the Middle District of Florida and venue is proper in this Court pursuant to 28 U.S.C. § 1391.

3. Plaintiff, Austin Clary, is an adult citizen of the United States and a resident of Brevard County, Florida. He was 22 years of age in 2010 when the incidents complained of herein occurred.

4. Defendant, Brevard County Sheriff Wayne Ivey, is the current Sheriff of Brevard County, and the Sheriff is a constitutional officer responsible for operation and final policy-making for the Brevard County Jail. The Sheriff is sued in his official capacity only.

5. Defendant, ARMOR CORRECTIONAL HEALTH SERVICES, INC. (hereinafter "Armor"), is a for-profit corporation that contracted with the Sheriff, and acted as the Sheriff's agent, to provide medical services to, inter alia, jail inmates during the period while Mr. Clary was incarcerated in the jail in November, 2010.

6. Mr. Clary was arrested and taken to the Jail and placed in the custody of the Sheriff on November 24, 2010, for the misdemeanor charge of driving under the influence.

7. At the time of his incarceration, Mr. Clary suffered from Hypo Kalemic Periodic Paralysis, a serious medical condition that required specialized medical treatment. Mr. Clary was in need of specialized medical treatment and care to monitor his symptoms, alleviate the discomfort he was experiencing and to prevent the onset of a state of progressive paralysis. Furthermore, the effect of lapses into paralysis and other extreme sequela are cumulatively deleterious for Mr. Clary's health and for the health of all people who suffer from the condition.

8. Upon being arrested, Mr. Clary advised the arresting officers and then the Jail's booking officers -- including the medical intake personnel -- that he suffered from the disease Hypo Kalemic Periodic Paralysis. Mr. Clary specifically told the booking officers that his medical condition required that he take special physician prescribed medicine on a daily basis to

prevent going into a state of paralysis. Mr. Clary further advised the booking officers that if he did not receive his prescribed medications that he would fall into a state of total paralysis that could lead to heart failure and death. The booking officers responded to Mr. Clary by telling him that "they had it under control."

9. In addition to what Mr. Clary advised the Jail, Mr. Clary s mother and brother talked to Jail personnel on the evening of November 24, 2010, and advised the Jail of Mr. Clary's medical condition and of the dire consequences if Mr. Clary did not receive his medication.

10. Mr. Clary's father, who is a Firefighter/paramedic and registered nurse (RN) employed at Kennedy Space Center, personally talked to the Jail head nurse on the morning of November 25, 2010, and discussed Mr. Clary's condition and dire need for medicine. The Head Nurse explained to Mr. Clary's father that according to Jail policy there was nothing she could do until the Jail doctor confirmed Mr. Clary's condition and need for medication.

11. Mr. Clary also advised Defendants' supervising employees of his medical condition and need for his medication. Mr. Clary explained to said Defendants' employees that he needed to take his medication each morning and each night and that if he did not take his medication that he would suffer the onset of a state of paralysis that could lead to eventual inability to breathe, possible heart stoppage and death.

12. Defendants' employees told Mr. Clary that they were aware of his condition and medical needs and that they would see that he received his medicine.

13. Mr. Clary was first left in an observation cell overnight where he was left to sleep on the bare floor. The following morning Mr. Clary was placed in the medical unit of the Jail in a separate cell without a bed so that Mr. Clary was again required to lay on the bare floor.

14. Mr. Clary again explained to several of the nursing personnel in the medical unit about his medical condition and need for his medication. Each time Mr. Clary explained, he was basically told that the person understood his medical condition and that he would receive treatment.

15. Notwithstanding what Mr. Clary and his family advised Defendants' employees and what the defendants acknowledged understanding as to Mr. Clary's medical condition, the Jail medical unit nursing staff did not give Mr. Clary his required medication. Instead, a medical unit nurse gave Mr. Clary two pills that Mr. Clary did not recognize and told Mr. Clary when he complained that the pills were not his required medication that the Jail pharmacist said that was the only medication that he needed. Mr. Clary ingested the pills.

16. Soon after being refused by the Jail to provide Mr. Clary with the medication that he needed on the morning of November 25, 2010, Mr. Clary took a nap while lying on the floor of his cell. Upon awakening from his nap Mr. Clary was unable to move his legs and could barely move his arms. Mr. Clary shouted for help but none came, even though he was allegedly under 24 hour observation.

17. About 10 A.M. on November 25, 2010, a Jail guard came to Mr. Clary's cell to take him to a court appearance within the Jail. At that time, Mr. Clary still was unable to walk and had limited ability to move his arms. Mr. Clary again tried to explain to the guard about his condition and what medication he needed, but the guard ignored his explanation. The guard merely got a wheelchair for Mr. Clary and took him to the Jail courtroom in the wheelchair. Sheriff's employees told Mr. Clary not to speak to the judge.

18. At this time Mr. Clary's paralysis continued to worsen. Mr. Clary was returned by wheelchair to his cell in the medical unit after his court appearance. Mr. Clary was not assisted out of his wheelchair by any of Defendants' employees. In the presence of Defendants' employees, Mr. Clary was callously allowed to fall out of his wheelchair onto the cell floor where he was then left to lie there for the remainder of the time that he remained at the Jail. During this time Mr. Clary's condition progressed to the point where he was in a state of almost total paralysis. Mr. Clary continued to cry out for assistance as long as he was able to speak but his cries were ignored by Defendants' employees.

19. Defendants' employees who came to Mr. Clary's cell to observe him and to check his vital signs told Mr. Clary that everything was "OK." Without first having a doctor examine him, Defendants' employees told Mr. Clary that they did not believe he was experiencing any form of paralysis and that they believed that he was faking his medical situation and that he was not in a state of paralysis.

20. Mr. Clary begged the nursing personnel to give him his medication and to take him to a hospital. All of Mr. Clary's requests were denied.

21. While Mr. Clary was lying on the floor in a state of paralysis, one of the Jail guards brought Mr. Clary his lunch. This guard placed the lunch plate on the floor next to Mr. Clary's head and told Mr. Clary that when he was hungry enough that he would get up and eat his lunch. Mr. Clary again repeated his need for his medication and told the guard that his medical condition was real. Again, Mr. Clary's entreaties were ignored.

22. While Mr. Clary was lying paralyzed on the jail floor and his condition was worsening, he heard Defendants' employees outside his cell laughing at him and calling out to him various derogatory names.

23. At no time during the period of his incarceration at the Jail was Mr. Clary seen or interviewed by a doctor.

24. At approximately 3 PM on November 25, 2010, some guards came to Mr. Clary's cell and told him that he was free to go. Mr. Clary was then in a complete state of paralysis and could not move. He was barely able to whisper but managed to tell the guards that he could not move.

25. The guards were all laughing at him, and one of the them, a female guard, said to Mr. Clary "I bet you would move if I stepped on your foot" and then she kicked his foot.

26. Mr. Clary was told by one of the supervising guards that Mr. Clary would be Baker Acted, a form of involuntary incarceration for mental incapacity, if he did not get up and walk out and that Mr. Clary would not then be able to leave the Jail.

27. At that point and until he finally received medical care at a hospital, due to the onset and continuation of paralysis, and because of the deliberate indifference and torment inflicted upon him by Defendants' employees, Mr. Clary believed that he was going to die in front of all of the guards and Armor personnel who were still standing there laughing at him.

28. At some point while still lying on the Jail cell floor Mr. Clary regurgitated stomach material into his mouth and began to choke on the regurgitated material. Due to the state of Mr. Clary's paralysis he was not able to roll over to expel the regurgitated material from his mouth and throat. The Sheriff's employees laughed at Mr. Clary. At that point a nurse's aide came over

to Mr. Clary and rolled him over to prevent him from choking further on the regurgitated material in his mouth.

29. Mr. Clary again requested the Jail guards to contact his brother, Colton Clary, who would be able to confirm the nature and severity of Mr. Clary s condition. The Jail personnel placed a call to Colton Clary and placed the phone to Mr. Clary's ear and let Mr. Clary talk to his brother. No Jail personnel talked to Colton Clary at that time.

30. Eventually one of the Sheriff's employees said that because Mr. Clary was technically released, Mr. Clary would be liable for any financial charges for any medical care he obtained from that time forward. At that point, an ambulance was called to the Jail to transport Mr. Clary to the hospital. When the ambulance arrived Mr. Clary heard the Sheriff's guards telling the paramedics that Mr. Clary was faking his condition.

31. The paramedics who responded to the call found Mr. Clary lying on the floor with Armor medical staff standing around. Jail staff stated to paramedics that Mr. Clary was complaining that he could not move his arms or legs due to a low potassium level. The paramedics picked Mr. Clary up from the floor, placed him on a gurney and transported Mr. Clary to Wuesthoff Hospital where he was admitted to the emergency room at approximately 4 PM on November 25, 2010.

32. When Mr. Clary was first admitted to the emergency room he was not able to move his legs or arms, was unable to move his neck and was not able to swallow. After being put on medication Mr. Clary's condition gradually improved. At approximately 3:30 AM, November 26, 2010, Mr. Clary was finally able to freely move his arms and legs and was able to swallow.

33. After Mr. Clary's admission to Wuesthoff Hospital it was determined that his potassium levels were at a near fatal level. Mr. Clary was placed in the intensive care unit where he remained and received treatment during the next two days. Mr. Clary was released from Wuesthoff Hospital on or about November 27, 2010.

34. At all times relevant, Defendants employees were acting within the course and scope of their respective duties.

35. At all times relevant, Defendants and their respective employees were acting under color of state law.

36. Mr. Clary, while a pretrial detainee at the Jail, has the right to due process under the Fourteenth Amendment of the Constitution of the United States to be provided adequate care by Defendants for his serious medical needs.

37. While acting under color of state law, Defendants violated Mr. Clary's Fourteenth Amendment right to due process by manifesting deliberate indifference to Mr. Clary's serious needs for medical care.

38. Defendants' deliberate indifference to Mr. Clary's serious needs for medical care is devoid of phenological or other legitimate merit.

39. Defendants' deliberate indifference to Mr. Clary's serious needs for medical care is a wanton and unnecessary infliction of pain and other injury against Mr. Clary.

40. Defendants have denied medical care to Mr. Clary with practices that are not reasonably related to legitimate phenological or other objectives.

41. Defendants' deliberate indifference to Mr. Clary's needs for medical care exhibits a conscious and callous indifference to Mr. Clary's serious medical needs and to Mr. Clary's

rights to due process; and, Defendants' degree of disregard for Mr. Clary's rights to adequate medical care for serious medical needs offend established standards of decency and are antithetical to a civilized society.

42. Defendants' final policymakers delegated their authority to one or more subordinates and/or agents, who, in turn, caused deprivation of Mr. Clary's constitutional right to medical care for his serious medical needs; and/or, Defendants' final policymakers ratified a constitutionally impermissible decision or recommendation of one or more of their respective subordinate employees and/or agents.

43. Defendants' denial of medical care for Mr. Clary is due to Defendants' policy or custom to permit, perpetrate, condone, and/or perpetuate the violation of Mr. Clary's right to medical care for serious medical needs.

44. Defendants' denial of medical care for Mr. Clary is due to Defendants' policy or custom of deliberate indifference to Mr. Clary's serious medical needs and to Mr. Clary's right to due process.

45. Additionally or alternatively, Defendants are negligent in training and/or supervising their respective employees and agents who participated in the violation of Mr. Clary's right to medical care because Defendants failed to adequately train and/or supervise their employees and agents to handle recurring situations presenting an obvious potential for such violation.

46. In light of the duties of protecting Jail inmates against denial of medical care for serious medical needs, the need for more or different training and/or supervision is and has been so obvious that Defendants are deliberately indifferent to the need for such training.

47. As a direct and proximate result of Defendants' deliberate and callous indifference to Mr. Clary's need for medical care for serious medical needs as described in this Count, Mr. Clary has been injured and has suffered damages, including severe physical pain and suffering, severe mental anguish and emotional distress, loss of capacity to enjoy life, costs, and attorney fees.

48. Mr. Clary demands all relief that is just and equitable from each Defendant, jointly and severally, including compensatory damages, costs, and attorney fees as provided by 42 U.S.C. § 1988.

49. Mr. Clary also demands punitive damages from Defendant Armor.

50. In the event of default by one or both Defendants, Mr. Clary demands $5,000,000.00 in compensatory damages, plus costs and attorney fees, as liquidated damages from each defaulting Defendant, for this Count only.

## COUNT II. SIMPLE NEGLIGENCE FOR DEPRIVING ACCESS TO MEDICAL CARE
### against the Sheriff only

51. Mr. Clary realleges Paragraphs 1 through 34, and states additionally or alternatively:.

52. This Court has supplemental jurisdiction of the subject matter of this claim by virtue of 28 U.S.C. § 1367, as to all claims arising under the laws and Constitution of the State of Florida that are so related to the claims of which this Court has original jurisdiction and which form part of the same case or controversy.

53. Mr. Clary has complied with the administrative requirements of Fla. Stat. § 768.28 by submitting the required notices to the Sheriff and the State of Florida, Department of Financial Services, in a timely manner more than six months before the filing of this lawsuit.

Furthermore, as this claim is for negligent denial of access to medical care, and not one for negligent medical malpractice or otherwise involving medical decisions, Florida's medmal presuit requirements to not apply.

54. At all times while Mr. Clary was in the jail, the Sheriff owed Mr. Clary a duty to provide Mr. Clary with access to medical care for Mr. Clary's medical needs.

55. Although Defendants knew or should have known that Mr. Clary had a serious and immediate need for access to medical care, the Sheriff breached its duty to provide adequate access to medical care to Mr. Clary.

56. It was reasonably foreseeable that if the Sheriff breached its duty to provide such access, Mr. Clary would be harmed.

57. The Sheriff's breach of duty was the proximate cause of harm to Mr. Clary, including physical suffering and severe emotional distress.

58. Because of the Sheriff's negligence regarding providing access to medical care for Mr. Clary, Mr. Clary has been injured and has suffered damages, including physical pain and suffering, severe mental anguish and emotional distress, loss of capacity to enjoy life, and costs of this action.

59. Mr. Clary demands all relief that is just and equitable from the Sheriff, including compensatory damages and the taxable costs of this action.

### Count III. Negligent Training
### against Sheriff

60. Plaintiff realleges Paragraphs 1 through 34 and Paragraphs 52 through 53, and states additionally or alternatively:

11

61. The Sheriff had a duty to train its employees to prevent the type of loss, injury, and damage suffered by Mr. Clary in situations like that described in Paragraphs 6 through 33 above.

62. Upon information and belief, the evidence is likely to show that the Sheriff breached that duty to Plaintiff by failing to adequately train its employees to handle the foreseeable situations present in the instant case, including that he was denied access to adequate and competent medical treatment, care and facilities; that the Defendants Brevard County Jail officials and their employees failed and refused to provide Mr. Clary with necessary prescription medication and treatment, failed and refused to have Mr. Clary treated by a doctor, and failed and refused to deliver prescribed medications.

63. The Sheriff's breach of its duty to train its employees was the proximate cause of loss, injury, and damage to Mr. Clary.

64. Because of the Sheriff's breach of duty to Mr. Clary as described in this Count, he has been injured and has suffered damages, including pain and suffering, mental anguish and emotional distress, loss of capacity to enjoy life, economic damages, costs, and attorney fees.

65. Mr. Clary demands all relief that is just and equitable, including compensatory damages and court costs.

### Count IV. Negligent Supervision
### against Sheriff

66. Plaintiff realleges Paragraphs 1 through 34 and Paragraphs 52 through 53, and states additionally or alternatively:

67. The Sheriff had a duty to supervise its employees to prevent the type of loss, injury, and damage suffered by Mr. Clary in situations like that described in Paragraphs 6 through 33 above.

68. Upon information and belief, the evidence is likely to show that the Sheriff breached that duty to Plaintiff by failing to adequately supervise its employees to handle the foreseeable situations present in the instant case.

69. The Sheriff's breach of its duty to supervise its employees was the proximate cause of loss, injury, and damage to Mr. Clary.

70. Because of the Sheriff's breach of duty to Mr. Clary as described in this Count, he has been injured and has suffered damages, including pain and suffering, mental anguish and emotional distress, loss of capacity to enjoy life, economic damages, costs, and attorney fees.

71. Mr. Clary demands all relief that is just and equitable, including compensatory damages and court costs.

## Count V. Negligent Retention

### against Sheriff

72. Plaintiff realleges Paragraphs 1 through 34 and Paragraphs 52 through 53, and states additionally or alternatively:

73. The Sheriff had a duty to assign, re-assign, and/or discharge (collectively referred to as "retention") its employees to prevent the type of loss, injury, and damage suffered by Mr. Clary in situations like that described in Paragraphs 6 through 33 above.

74. Upon information and belief, the evidence is likely to show that the Sheriff breached that duty to Plaintiff by failing to properly retain its employees to handle the foreseeable situations present in the instant case.

75. The Sheriff's breach of its duty to retain its employees was the proximate cause of loss, injury, and damage to Mr. Clary.

76. Because of the Sheriff's breach of duty to Mr. Clary as described in this Count, he has been injured and has suffered damages, including pain and suffering, mental anguish and emotional distress, loss of capacity to enjoy life, economic damages, costs, and attorney fees.

77. Mr. Clary demands all relief that is just and equitable, including compensatory damages and court costs.

## Count VI.  Negligent Training

### against Armor

78. Plaintiff realleges Paragraphs 1 through 34 and Paragraphs 52 through 53, and states additionally or alternatively:

79. Armor had a duty to train its employees to prevent the type of loss, injury, and damage suffered by Mr. Clary in situations like that described in Paragraphs 6 through 33 above.

80. Upon information and belief, the evidence is likely to show that Armor breached that duty to Plaintiff by failing to adequately train its employees to handle the foreseeable situations present in the instant case, including that he was denied access to adequate and competent medical treatment, care and facilities; that Armor's employees failed and refused to provide Mr. Clary with necessary prescription medication and treatment, failed and refused to have Mr. Clary treated by a doctor, and failed and refused to deliver prescribed medications.

81. Armor's breach of its duty to train its employees was the proximate cause of loss, injury, and damage to Mr. Clary.

82. Because of Armor's breach of duty to Mr. Clary as described in this Count, he has been injured and has suffered damages, including pain and suffering, mental anguish and emotional distress, loss of capacity to enjoy life, economic damages, costs, and attorney fees.

83. Mr. Clary demands all relief that is just and equitable, including compensatory damages and court costs.

84. Because Armor's negligence as alleged in this Count was so willful, wanton, and in callous disregard of health, safety, and legal rights, as to constitute gross negligence, Mr. Clary also demands punitive damages against Armor.

### Count VII. Negligent Supervision

### against Armor

85. Plaintiff realleges Paragraphs 1 through 34 and Paragraphs 52 through 53, and states additionally or alternatively:

86. Armor had a duty to supervise its employees to prevent the type of loss, injury, and damage suffered by Mr. Clary in situations like that described in Paragraphs 6 through 33 above.

87. Upon information and belief, the evidence is likely to show that Armor breached that duty to Plaintiff by failing to adequately supervise its employees to handle the foreseeable situations present in the instant case.

88. Armor's breach of its duty to supervise its employees was the proximate cause of loss, injury, and damage to Mr. Clary.

89. Because of Armor's breach of duty to Mr. Clary as described in this Count, he has been injured and has suffered damages, including pain and suffering, mental anguish and emotional distress, loss of capacity to enjoy life, economic damages, costs, and attorney fees.

90. Mr. Clary demands all relief that is just and equitable, including compensatory damages and court costs.

91. Because Armor's negligence as alleged in this Count was so willful, wanton, and in callous disregard of health, safety, and legal rights, as to constitute gross negligence, Mr. Clary also demands punitive damages against Armor.

### Count VIII. Negligent Retention

### against Armor

92. Plaintiff realleges Paragraphs 1 through 34 and Paragraphs 52 through 53, and states additionally or alternatively:

93. Armor had a duty to assign, re-assign, and/or discharge (collectively referred to as "retention") its employees to prevent the type of loss, injury, and damage suffered by Mr. Clary in situations like that described in Paragraphs 6 through 33 above.

94. Upon information and belief, the evidence is likely to show that Armor breached that duty to Plaintiff by failing to properly retain its employees to handle the foreseeable situations present in the instant case.

95. Armor's breach of its duty to retain its employees was the proximate cause of loss, injury, and damage to Mr. Clary.

96. Because of Armor's breach of duty to Mr. Clary as described in this Count, he has been injured and has suffered damages, including pain and suffering, mental anguish and emotional distress, loss of capacity to enjoy life, economic damages, costs, and attorney fees.

97. Mr. Clary demands all relief that is just and equitable, including compensatory damages and court costs.

98. Because Armor's negligence as alleged in this Count was so willful, wanton, and in callous disregard of health, safety, and legal rights, as to constitute gross negligence, Mr. Clary also demands punitive damages against Armor.

### Demand for Jury Trial

Mr. Clary demands trial by jury on all issues so triable.

### VERIFICATION

Pursuant to Florida Statute § 92.525 and under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true and correct.

Signed and Dated this Eighth day of January, 2013, by:

*/signature/* Austin Clary

Respectfully submitted by:

Mark E. Tietig
Fla. Bar No. 105465
Tietig & Tietig, P.A.
6065 South Tropical Trail
Merritt Island, FL 32952
(321) 452-9944
Facsimile: (321) 452-6960
mt@tietig.com
Attorney for Plaintiff Austin Clary